## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KRISTEN MORALES,** | * | **CIVIL ACTION NO.:** |
| **Plaintiff,** | * | |
| **v.** | * | **JUDGE:** |
| | * | |
| **CITY OF NEW ORLEANS, OFFICE OF OIG** | * | **MAGISTRATE JUDGE:** |
| **THROUGH ED MICHEL, INTERIM** | * | |
| **INSPECTOR GENERAL, AND BOBBIE** | * | |
| **JONES.** | * | |
| **Defendants.** | * | **JURY DEMANDED** |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, KRISTEN MORALES ("Morales"), who hereby files this Complaint and respectfully avers, as follows:

## INTRODUCTION

1.      Plaintiff brings this action for declaratory judgment, equitable relief, and monetary damages to secure the protection against and to redress unlawful discrimination on the basis of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et. seq.*, as amended ("Title VII"), Louisiana Whistleblower Act codified as LSA-R.S. §23:967, and on the basis of gender and race/ethnicity under the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et. seq.*, as amended ("Title VII"), 42 U.S.C §1983, §1985; Louisiana laws prohibiting intentional discrimination including the Louisiana Employment Discrimination Law codified as LSA-R.S. 23:332, *et seq.*, and La. Civil Code 2315 for defamation and cyberstalking/hacking.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction of the Plaintiff's Section 1981 claims pursuant to 28 U.S.C. §§1331 and 1343. The Court has original jurisdiction of the plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331, 1343, 2202, and 42 U.S.C. §2000e-5.

3.     Supplemental jurisdiction over Complainant's state law claims is invoked under both Rule 18 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367, because they are part of the same case or controversy as Complainant's federal claims.

4.     This Court has personal jurisdiction over the Defendants- as each defendant is either domiciled in the Eastern District of Louisiana and the acts and omissions of all defendants occurred in the Eastern District of Louisiana.

5.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted occurred in the Eastern District.

6.     Venue is also proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391 and 42 U.S.C.A. §2000e-5(g).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     Complainant has satisfied all administrative prerequisites for filing suit under Title VII and the Louisiana Employment Discrimination Law, R.S. 23:302 *et. seq*.

8.     On or about November 23, 2020, Morales filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On May 10, 2021, Morales filed an Amended Charge of Discrimination with the EEOC.

9.     On July 30, 2021, the U.S. Department of Justice Civil Rights Division issued a Notice of Right to Sue.

10.    This Complaint is being filed within 90 days of Complainant's receipt of the Notice

of Right to Sue.

## THE PARTIES

11.     Plaintiff, Kristen Morales ("Morales"), is a person of the full age of majority, domiciled in the Parish of Jefferson, State of Louisiana. Morales was employed as a Criminal Investigator for The New Orleans Office of Inspector General from April 18, 2011, until her termination on January 7, 2021. She was a permanent civil servant at the time of her termination and held the title of Criminal Investigator IV.

12.     Defendant City of New Orleans ("CNO" or "Orleans Parish") is a government body created pursuant to the laws of the State of Louisiana and is located within the Eastern District of Louisiana. At all relevant times, CNO is and was the Complainant's employer through the Office of Inspector General and had at least 20 employees.

13.     Defendant Ed Michel is the Interim Inspector of the Office of Inspector General for Orleans Parish. Suit is brought against him in his official and individual capacities.

14.     Defendant, Bobbie Jones is the I.T. Specialist at the Office of Inspector General. Suit is brought against her in her personal capacity

15.     Each of the acts and omissions complained of in this Complaint were committed by the defendant and its agents while in the course and scope of their employment with CNO.

16.     In doing the acts and/or omissions alleged, Defendants CNO and Michel acted under color of authority and/or color of state law.

## FACTUAL ALLEGATIONS

17.     Plaintiff, Morales, was hired to work as a Criminal Investigator I, for the New Orleans Office of Inspector General, on or about April 18, 2011. Morales was a permanently classified civil servant at the time of her termination and held the position of Criminal

Investigator IV.

18.     As a Criminal Investigator Morales was tasked with investigating cases, including, but not limited to evaluating complaints, developing investigative plans, and handling cases according to Investigative Manual (IM) procedures.

19.     As a Criminal Investigator, Morales was responsible for conducting interviews of subjects of investigations, conducting field investigations, interviewing witnesses, performing covert surveillance, and reporting results. The Investigator develops compiles, reviews, handles, and transports documents and evidence relative to investigations. The Investigator charts and reports case progress, issues status reports and closing reports, drafts subpoena and summons requests and closing memos when so assigned. The Investigator must also give testimony before administrative hearings and in the courtroom when required.

20.     Morales was wrongfully terminated on January 7, 2021, in retaliation for filing an EEO charge of discrimination, opposing discriminatory and unethical practices, and reporting violations of state and federal law, in violation of Title VII and the LEDL.

21.     Morales was also wrongfully suspended effective December 14, 2020, for 30 days without pay prior to her termination. She was subjected to a hostile work environment and intentionally harassed and targeted in a concerted effort to wrongfully discipline and terminate her.

22.     After lodging internal complaints, Morales was retaliated against through a series of attempts to discredit her and harm her professional reputation and force her out of her job.

23.     Morales made an internal complaint to management in January of 2019 Morales that she was treated differently than her male colleagues in the Criminal

Investigations Unit. One of the allegations was concerning a pay increase for extraordinary pay for a certification she received in 2016.

24.     Eleven months after lodging her complaint Morales received approval from Assistant Inspector General (AIG.) of Criminal Investigations, Ed Michel and Inspector General (I.G.) Harper to receive a 5% pay increase for obtaining a certification related to her field. Morales followed up on the request to process the required paperwork from December of 2019 through January of 2020 with no resolution.

25.     In January 2019 Morales also complained to her supervisor William Bonney, Deputy Inspector General for Criminal Investigations. She expressed that it was unfair that she was held to a different standard than her male co-workers because she was the only Criminal Investigator required to maintain minimum certifications, while her three male co-workers were not held to the same standard. In response to her complaint, Bonney threatened Morales "not to go down that road". He also instructed her that she needed to explain to the team what she was doing, why, and how her training could be of value to their investigations. Morales was told to do this to ease her male colleague's tension. After Morales protested, Bonney advised her that they have an "old fashioned" way of thinking. His resolution was for Morales to placate them instead of addressing the discrimination and unequal treatment.

26.     Morales did not heed Bonney's threat and on or around January 15, 2019, she filed an internal complaint to the (former) Inspector General, Derry Harper of discrimination and that she was treated less favorably than her male colleagues.

27.     An investigation was undergone, however, the issues Morales raised in her internal complaint concerning unequal pay and disparate treatment with regard to her male criminal investigator colleagues were not investigated nor resolved.

28.     On or around December 5, 2019, Morales learned from a New Orleans FBI Agent that the Agent met with a City of New Orleans (CNO) employee without Morales's knowledge or involvement. At this time the federal agency did not have an open case into the matter that Morales was assigned as the lead investigator. Morales had previously contacted the same CNO employee several weeks prior. Morales refrained from interviewing the employee as a courtesy to the federal partners and based on a request from the AUSA's office to coordinate efforts. The actions resulted in Morales being prevented from interviewing this critical witness. In response, Morales voiced her objections to the AUSA, and her chain of command, including the counsel for the OIG about the agents' conduct and potential legal repercussions to the active criminal investigation.

29.     On January 23, 2020, Morales filed an internal grievance, after being encouraged by Interim Inspector General Ed Michel, who at the time served as the Assistant Inspector General in response to personal attacks by Deputy Inspector Erica Smith and previous unresolved matters. On January 22, 2020, a meeting was held with Assistant Inspector General (AIG) Larry Douglas, Former General Counsel, Patrice Sullivan, then AIG Ed Michel, Deputy Erica Smith and Morales. The meeting was held because it was discovered that Smith conducted interviews of personnel within the same City Department where Morales was conducting confidential interviews with their federal counterparts for a criminal investigation. This action was against policy and a previously determined agreement designed to protect the confidentiality and integrity of the criminal investigation.

30.     Just a few days after filing her grievance, on January 28, 2020, then Assistant Inspector General for the Criminal Investigations Division, Ed Michel advised Morales that unidentified federal partners from the FBI requested that Morales be removed from a federal case she was assigned. Morales asked what the allegation was, but Michel refused to provide her with

any information.

31.     On or about March 2, 2020, after continued requests for further information, Michel advised Morales that she had been accused of associating with known felons. Michel advised that a photograph taken of her while traveling to the Heisman Trophy ceremony in 2019, which Morales texted to Michel at the time of the trip, showed that the pilot who flew the plane had a federal record. Michel also advised that the Morales was further accused of identifying herself as an FBI agent during an interview, talked to FBI sources, and tried to reach out to FBI sources through social media. Morales objected to the claims and advised Michel that the claims were false, defamatory, and baseless. Morales requested that Michel address the matter with I.G. Harper. In response, I.G. Harper advised that Morales would not be removed from her assigned cases and that the allegations were baseless.

32.     On or around March 05, 2020, Morales discovered that the report of the interview conducted in January 2020 with the agents whom she complained about previously, excluded pertinent information, including, the interviewee's name, documents provided during the interview and statements. Morales immediately brought this to management's attention. She advised that at a minimum, it was unethical but believed the action of excluding evidence presented during the interview was illegal.

33.     Morales requested that Michel inform then I.G. Harper and General Counsel to address the issue and Morales' concerns with the actions of their federal partners. Morales followed up with Michel in February and March of 2020, to no avail.

34.     On or around March 11, 2020, while conducting an interview with federal partners, one of the agents forcefully placed his arm across Morales's breast and chest. While the Agent touched Morales's chest, he instructed her to stop taking notes. Morales moved the Agent's

arm off her chest, but he repeated the behavior for a second time to which Morales told him to stop. Morales immediately texted her supervisor, Centola, and reported the incident. In response AIG, Michel told Morales that he would contact the Agent's supervisors about the incident.

35.     On May 15, 2020, Morales was advised that Civil Service rejected her request for a 5% pay increase. That same day, however, Morales was informed by the Human Resource (HR) Manager that her colleagues Michael Centola and Terence Barrett had also applied for the incentive pay, listing the same certification and were approved. After speaking with Michel, he advised Morales to list a different certification and reapply. Morales objected that the denial was disparate treatment but followed Michel's instruction and reapplied under a different certification. The issue was never resolved prior to Morales's termination.

36.     In July of 2020, Morales contracted COVID and was out for an extended period. While recovering from her illness, Morales quarantined with her boyfriend at his residence in Kenner, Louisiana. Morales advised the I.G. and General Counsel and Chief Centola, of her illness and need to quarantine outside of her residence. Morales was never advised that she was in violation of any policies for staying in Kenner to quarantine and recover, per doctor orders.

37.     On or around August 6, 2020, Morales learned from an Assistant United States Attorney (AUSA) that she had been removed from a federal case, by her Supervisor, Ed Michel. Morales was the lead investigator on this case for several years. Morales believes that AIG Michel removed Morales from the case in retaliation for reporting unethical and illegal activity by the federal agent she made a complaint about. Morales reported the matter to I.G. Harper who advised her that he did not authorize her removal from the case.  Morales also expressed concern that she would be further retaliated against, and that Michel would try to terminate her for speaking out about the unethical and illegal conduct she reported.

38.     On August 14, 2020, Morales emailed Chief Centola requesting confirmation of her federal case assignments after she was told that she was removed from the same federal case for which she was the lead investigator. Morales received confirmation from I.G. Harper that she was still on the federal case. Morales needed to know the status of her involvement in due to upcoming time sensitive interviews.

39.     Morales followed up with I.G. Harper on September 9, 2020, advising that she needed to attend an interview for another high-profile investigation the following week but the AUSA, Michel, and Centola were telling her that they were waiting on I.G. Harper for permission for Morales to continue working on the cases. A few hours later I.G. Harper emailed Michel advising that Morales remained assigned to the cases for any and all investigative activities, however, Morales was prevented from attending the interview by Chief Centola, who went in her place.

40.     Just two days later, on September 11, 2020, Morales was emailed a Letter of Reprimand (L.O.R.) by I.G. Counsel Patrice Sullivan, dated September 9, 2020. The L.O.R. alleged that Morales failed to record any investigative hours in the case management system, Wingswept, without being reminded, from December 29, 2019, through July 4, 2020.

41.     Following issuance of the L.O.R. Michel emailed I.G. Harper furious that Morales was not terminated or suspended over the Wingswept issue.

42.     Morales immediately appealed the L.O.R. through Civil Service, fearing that Michel was trying to set her up for termination. The retaliation, targeting, and harassment intensified after Morales filed her Civil Service Appeal.

43.     On September 11, 2020, Morales also emailed I.G. Harper and counsel advising that she received a call from the AUSA to set up an interview the following week for one of the

federal cases that Michel had previously removed her from working. Morales advised the AUSA of I.G. Harper's email regarding case status and her continued assignment. Morales requested assistance because her supervisor, Chief Centola advised Morales that the federal agency had not contacted him about her continued work assignment.  In response to Morales's email, Michel chastised Morales.

44.     On September 25, 2020, Morales emailed OIG Counsel Sullivan and I.G. Harper requesting the evidence collected and results of the investigation into Morales's complaints related to the FBI's false accusations concerning the Heisman event, and serious evidentiary issues related to documents and information left out of a report for interview. Morales noted that she previously expressed concern to DIG Bonney and Chief Centola about interactions with specific agents. Morales brought the matter up to Michel, who advised that he would have coffee with the agent's supervisor to address the matters.

45.     During the fall of 2020 Morales was interviewed by OIG counsel in response to an allegation that Morales recorded an interview where FBI Agents were present, and Morales may be recording internal conversations. Chief Centola later informed Morales that he made the allegation, even though he did not have any proof to support the claim.

46.     Morales advised OIG Counsel and I.G. Harper that AIG Michel retaliated against her by removing her from a case that she worked for six years. AIG Michel did not inform Morales or her supervisor, Chief Centola, of his decision to remove Morales from the case, provided no explanation, and only informed Agents of the New Orleans FBI Office. Since that time, the Agents continued to make false accusations against Morales, affecting her ability to work assigned cases. Morales advised that she feared that additional retaliation/suspension/ termination was imminent. Morales stated that IG Management was attempting to silence her

and/or would take additional retaliatory actions against her for reporting these matters.

47.     On multiple occasions Morales voiced her objections and concerns to her chain of command at the OIG. She advised that she felt that the cases she was assigned were being intentionally delayed by her supervisor's inaction.

48.     During the fall of 2020 Morales requested copies of her personnel file on multiple occasions. Her requests were unanswered, prompting her to file a Public Records Request. The request was also ignored, in violation of Louisiana Public Record law. Morales continued to request the information and advised her employer of the state law violation related to her public records request, to no avail.

49.     As part of her civil service appeal to the L.O.R. Morales submitted a subpoena request asking for her personnel file. Morales was advised by OIG counsel that the response to her subpoena, including her personnel file was ready to be disseminated to her. However, Morales did not receive the documents, and on October 29, 2020, was informed that OIG counsel was not permitted to respond to the request and that Morales needed to follow up with Michel.

50.     On October 31, 2020, I.G. Harper and General Counsel Sullivan resigned from their positions. In early November, Ed Michel was appointed as Interim Inspector General by the Chair of the Ethics Review Board, Michael Cowan.

51.     Morales continued to follow up concerning the status of her requests for her personnel file through Jessica Lang, the OIG Human Resources Manager. Prior to I.G. Harper's departure, he instructed Lang to provide Morales with the documents that were prepared to respond to her subpoena prior to his last day. After I.G. Harper's departure, however, Michel instructed Lang that she was not permitted to provide the responses to Morales that were ready for dissemination.

52.     At the same time, Morales contacted the New Orleans Chief Administrative Office (CAO) seeking relief from harm and advised that she feared she was being set up for termination. Morales's requests for assistance were left unanswered.

53.     After Michel's appointment to the position of Interim I.G. the targeting, harassment, and discriminatory conduct intensified to the point that Morales filed an EEOC Charge of Discrimination on November 23, 2020.

54.     On December 1, 2020, Morales was compelled to sit for an interrogation conducted by Chief Centola and witnessed by co-workers Larry Douglas and Terrance Barrett. It quickly became apparent that Morales was being investigated for multiple policy violations. During the interrogation, Morales was questioned on the following subjects:

    a.  If she recorded any phone calls or meetings with OIG members, and about Veritas (Veritas is the software utilized by the OIG for email archiving and data retention) activities from over a year or more ago.

    b.  If she gave an iPhone to Reginald Fournier, a cook who worked in the cafeteria of the building where the OIG is housed, approximately four or five years ago.

    c.  Centola characterized the questioning about her trip to the Heisman Trophy Ceremony as a gift she received.  Morales was invited to attend the event with a close family friend, Patti Scurlock. Ms. Scurlock has no relationship or contracts with the City of New Orleans but has been a close family friend for years. Ms. Scurlock chartered a plane for the trip.

    d.  Where she lived, if she was domiciled in Orleans parish, and if she slept at her house at night or with her significant other who lives in Jefferson

Parish. Morales questioned whether her male co-workers were asked where they sleep at night but did not get a response.

55.    Morales was instructed to gather evidence to support her responses to Chief Centola's questions but was not given any deadline for when she was required to provide evidence to oppose the claims.

56.    Less than two weeks later, on December 14, 2020, Michel instructed Morales that she was being suspended without pay but refused to provide her the reason for her suspension once she presented to the office.

57.    Approximately a week later, Morales received a letter of emergency suspension. The letter indicated that she was being suspended for 30 days without pay for the following policy violations:

    a.    Violation of Policy Memorandum 60(R), Policy Memorandum 83(R), and Louisiana Law by Giving Away an iPhone Owned by the OIG.

    b.    A Second Violation of Policy Memorandum No. 83(R) by Improperly Invading Another Employee's Personal Space (William A. Bonney).

    c.    A Violation of Policy Memorandum 83(R) and the Louisiana Code of Government Ethics by Accepting a Valuable Gift for Personal Benefit for accepting a free trip to the 2019 Heisman Trophy Ceremony and lack of candor for not immediately recalling the personal friends last name during the December 1 interrogation.

    d.    Violations of Policy Memorandum 19(R) and the City Domicile Ordinance.

    e.    Violations of Policy Memorandum 83(R) by Repeatedly and

Consistently Faling to Follow Supervisor's Directives.

f. Violations of Policy Memorandum 83(R) by Retaliating and Threatening Retaliation Against Other Employees for Reporting Your Perceived Misconduct and Policy Violations.

58. On December 22, 2020, Michel provided the EEOC with correspondence misrepresenting Morales's prior disciplinary history and facts related his actions to remove her from the federal cases she was assigned. Moreover, Michel stated that Morales had been previously counseled for each of the incidents listed in her Emergency Suspension letter of December 15, 2020, implying that an investigation and Morales's opportunity to refute the allegations had already occurred. However, Morales's opportunity to present evidence in her defense was not until January 7, 2021, the date of her pre-termination hearing. Michel's letter supports Morales's claim that her termination was pre-determined no matter what evidence she would provide in her defense.

59. On January 7, 2021, Morales presented for her pre-termination hearing. In support of her defense, she read a 15-page written statement refuting the allegations. Morales provided the OIG with the written statement and a binder of exhibits in support of her response. Notwithstanding Morales's lack of access to OIG databases to gather documentation to support her response, she was able to provide overwhelming evidence demonstrating that the allegations were false.

60. During the pre-termination hearing Bonney attempted to question Morales about additional allegations that were never listed in the suspension letter and to which she had no prior notice.

61. Morales was terminated the same day, immediately following completion of her

pre-termination hearing.

62. Five days later, on January 12, 2021, Morales received a copy of her termination letter. The letter included the same language from the suspension letter of December 15, 2020, with an additional sentence or two included at the end of each section advising that the documentation she provided during the pre-termination was not sufficient. The letter included absolutely no discussion of the evidence submitted or the basis of the finding by the OIG that Morales violated the stated policies or engaged in the alleged conduct.

63. Of importance, Morales's termination letter indicated that she was terminated for violating CAO Policy Memorandum 83(R)II(s), the City's anti-retaliation policy, as follows:

      a. For filing an EEO complaint on January 9 and 15, 2019,

      b. For filing a grievance on January 23, 2020, and supplementation to that grievance on February 12, 2020,

      c. For escalating her grievances to the CAO's office or advising that she would escalate her grievance,

      d. For filing an additional EEO Complaint on December 9, 2020.

64. Morales filed an appeal to both the termination and suspension with Civil Service. During the hearings for both the L.O.R., suspension, and termination, OIG witnesses testified that the OIG failed to follow standard investigatory policy and protocol; it became evident that OIG investigators created evidence in response to a subpoena duces tecum, and tampered with Morales's personnel file to pad her file with complaints from other employees, of which Morales was never previously advised.

65. During the hearing for the L.O.R. OIG representatives, Bonney, Centola, and Michel all testified that during their investigation into the allegations lodged in the L.O.R. that

Morales was the only employee who had periods of time not recorded in Wingswept. After Morales received the L.O.R., however, she ran a report through the Wingswept program to check if any other employees lacked hours in the system. Morales discovered that fellow Investigator IV, Terrence Barrett failed to enter hours into the system for 51 days in 2020 and 9 days in 2019; Centola failed to enter hours in for 27 days in 2020 and 19 days in 2019; and Bonney failed to enter hours for 28 days in 2020 and 10 days in 2019. The Criminal Investigative team was comprised of Bonney, Centola, Barrett and Morales, yet Morales was the only employee disciplined for the alleged violation.

66.     During Morales's Civil Service Appeal hearing for her suspension and termination Bonney testified that he drafted the termination letter and confirmed that the reference to the EEO complaint of December 9, 2020, referred to her EEOC Charge of Discrimination filed on November 23, 2020. The OIG produced a copy of the CAO memo advising the OIG of Morales's claim as support for her termination for filing an EEOC charge.

67.     Bonney also testified about support for the allegation that Morales was not domiciled in Orleans Parish. He confirmed that he conducted an interview with Morales's landlord after she was terminated and after she presented evidence that she lived in Orleans Parish at her pre-termination hearing. Bonney testified that Morales's landlord confirmed that she lived on Jewel Street. The OIG, however, still stands by the position that although Morales lived in Orleans Parish that she still violated the domicile ordinance.

68.     When Bonney was asked about the OIG's evidence to support the claim that Morales accepted a gift in violation of CAO policy, Bonney testified that he was not aware of any business that Morales's friend with whom she attended the December 2019 Heisman trophy ceremony had with the City of New Orleans or OIG, which would create a conflict of interest.

69.     Chief Centola testified that it was common knowledge in the office that Morales attended the 2019 Heisman Trophy Ceremony, but that Michel asked Centola to look into Morales's trip.

70.     During the same hearing, however, former I.G. Harper testified that he was aware of Morales's trip to the Heisman trophy ceremony on a private jet, the claims made by their federal counterparts, and that he investigated the issues and came to the conclusion that "there was no sufficient basis for any action" against her. The OIG, however, through Michel suspended and terminated Morales for this trip despite the fact that the I.G. and counsel already made a determination that it was not a policy violation.

71.     Neither Centola, Bonney, Michel nor Barrett ever interviewed I.G. Harper or OIG counsel to determine if they investigated concerns about a gift Morales had received for traveling to the Heisman Trophy Ceremony. Centola, Bonney, Michel neglected to ascertain whether or not Morales consulted management regarding this alleged gift. Instead, they waited until after I.G. Harper and OIG counsel departed the OIG to investigate the allegation related to the gift.

72.     It was also established through stipulation by the OIG that during its investigation into Morales, they failed to consult their own investigative policies and procedures, the Qualitative Standards Investigations Division.

73.     Multiple OIG employees, including Centola, Bonney and Michel testified that they were not aware of the policy violations related to the iPhone until the fall of 2020. OIG witnesses testified that they discovered that Morales gave away OIG property, when two employees of the Federal Reserve Bank, Daryl Turner and Reginald Fournier approached the OIG IT specialist, Bobbie Jones, and asked for an iPhone charger for the phone Morales donated to Fournier.

74.    The OIG provided Morales with memorandums of interview for Bobbie Jones, indicating that she learned about the iPhone when she was approached by Turner and Fournier in or around the fall of 2020.

75.    Jones holds a grudge against Morales, she previously filed a grievance against Morales and was disciplined for her animosity and unprofessional behavior toward Morales at work, she also previously alleged that Morales was reading other employee emails, an allegation that was deemed unfounded by the I.G. Jones also stated that she would look for another job if Morales regained her employment because it would be too difficult for Jones to work with Morales.

76.    Jones's story about how she found out about the iPhone proved to be untrue when both Turner and Fournier testified that they never approached Bobbie Jones to ask for a charger, in fact, they didn't even know who Bobbie Jones was, let alone had a conversation with her about a five-year-old iPhone.

77.    Morales was also accused of a lack of candor in the suspension and termination letters. Bonney testified that Morales exhibited lack of candor in her interview with Chief Centola on December 1, 2020, because she could not immediately recall the last name of the friend, she went on a trip with for the Heisman Ceremony in December of 2019. Morales provided the last name for her friend within minutes of the interview concluding and also provided an email to provide evidence that she provided Centola with her friend's full name. The OIG intentionally left this information out of the suspension and termination letter to falsely accuse Morales of lack of candor.

78.    No one ever attempted to verify the claims made by Jones, however, every effort was made to discredit any response Morales provided in her defense to the baseless claims lodged

against her.

79.     During Morales's civil service hearing, for the very first time, Michel changed his story and alleged that Morales *stole the iPhone that was given to Fournier and that she later lied about it.* Michel testified that Morales's actions constituted a lack of candor and therefore she could no longer work as an investigator because of "Giglio" concerns. It is unknown to what extent Michel has disseminated the false claims against Morales concerning theft and lying; neither of which was mentioned in the suspension or termination letters. However, Morales believes that Michel's false and defamatory statements have harmed her reputation and prevented her from gaining employment.

80.     While Morales's suspension and termination appeals were ongoing, on May 19, 2021, Bobbie Jones hacked into Morales's private Facebook account while Jones was at work. Jones changed Morales's passwords, locked her out of her account, and downloaded Morales's activity.

81.     Morales filed a police report for the illegal conduct. Upon information and belief Jones has not been disciplined for her illegal actions and for her false statements made against Morales that resulted in her termination.

82.     Morales is awaiting the ruling for the civil service appeals for her suspension and termination.

83.     Morales asserts that not only has she been retaliated against for opposing and reporting discriminatory, unethical, and illegal behavior, but that other employees outside her protected classes of race and gender at OIG have been treated more favorably than her, in particular:

      a.  Bobbie Jones (Caucasian Female) Jones was hired as an IT Specialist in

September of 2017. IT duties were previously Morales's responsibility. On February 7, 2019, Morales questioned Jones about her disclosures dated February 5, 2019, an ethical obligation for all OIG employees. Jones misrepresented her relationship with an OIG vendor, who was awarded a bid to provide a product to the OIG. Jones's actions created a conflict of interest which benefitted her friend financially. Although it was undisputed that Jones failed to follow policy and misrepresented information that resulted in a conflict of interest, she was not disciplined for the violation, yet Morales was terminated for lack of candor when she could not immediately recall her friends full name, and that her trip to the Heisman ceremony created a conflict of interest. Additionally, two witnesses impeached Jones's testimony during Morales's Civil Service hearing, yet upon information and belief, Jones has not been disciplined for her lack of candor.

b.  Terrence Barrett: (African American Male) Morales was disciplined and received a L.O.R. for failing to keep her hours up to date in Wingswept. Criminal Investigator IV, Barrett also had several days where he failed to enter his hours into Wingswept. Morales discovered that Terrence Barrett failed to enter hours into the system for 51 days in 2020 and 9 days in 2019; Centola failed to enter hours in for 27 days in 2020 and 19 days in 2019; and Bonney failed to enter hours for 28 days in 2020 and 10 days in 2019. The Criminal Investigative team was comprised of Bonney, Centola, Barrett, and Morales; yet Morales was the only employee disciplined for the alleged violation. Morales was also required to maintain her certification hours but

was not given the 5% pay increase that was awarded to Barrett for the same certification.

    c.   Lea Rae Webb: (Auditor Caucasian Female) Webb filed a grievance against Morales in January of 2019 claiming Morales walked too close to her and invaded Webb's personal space. Webb was permitted to escalate her grievance to the CAO's office without discipline or retaliation from OIG management. One of the reasons cited for Morales's termination is her escalation of grievances to the CAO.

84.    The Defendants acts and/or omissions caused Morales to suffer mental, emotional, and psychological harm.

85.    Morales has suffered substantial loss in present and future wages, employment benefits, and future career opportunities as a result of Defendants' unlawful conduct.

## CLAIMS FOR RELIEF

### COUNT 1
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation

86.    Morales re-alleges and incorporates herein by reference all the foregoing allegations.

87.    Morales engaged in protected activity, by opposing the disparate treatment and discrimination as described in preceding paragraphs, including but not limited to lodging internal complaints of discrimination and unfair treatment with her supervisors beginning in 2019, filing an EEOC Charge of Discrimination, advising her supervisors of unethical and what she perceived as illegal practices, advising her supervisors and OIG counsel of violations of Louisiana Public Records Law with regard to her requests for her personnel file, and filing a grievance against Bonney and seeking redress from harm through the CAO's office.

88.     The OIG through Michel, Bonney, Centola, and others, retaliated against Morales by engaging in a series of materially adverse actions against her that would have dissuaded a reasonable person from complaining of discrimination. Including but not limited to: utilizing the entire criminal investigations unit and other personnel to investigate Morales for a number of alleged policy violations after she filed an EEOC Charge of Discrimination; removing Morales from her assigned cases with no explanation and delaying her progress in said investigations after making complaints to her supervisors about conduct from federal partners; suspending and terminating Morales based on an allegation from an employee, Jones, who is known to harbor a grudge against Morales; failing to verify any of the claims made by Jones prior to instituting discipline; failing to follow the policies and procedures for investigations for the investigation into Morales; disregarding unrefuted proof of the falsity of the allegations lodged against Morales related to her suspension and termination; in addition to the other materially adverse actions outlined in paragraphs 17- 85.

89.     Defendant OIG took the adverse actions against Morales because of her protected activities, opposing discrimination and complaining of discrimination, filing a Charge of Discrimination with the EEOC; and appealing her suspension and termination.

90.     Defendants OIG and Michel's actions were taken with malice and reckless disregard for Morales's right to be free from discrimination in the workplace.

91.     For the foregoing reasons, Morales is entitled to relief against the OIG and Michel for retaliation in violation of 42 U.S.C. § 2000-e3(a).

## COUNT 2
### Conspiracy to Interfere with Civil Rights
### 42 U.S.C. § 1985 (3)

100.     Morales re-alleges and incorporates herein by reference all the foregoing allegations.

101.     Morales brings an action for Conspiracy to Interfere with her civil rights against Defendants. Morales alleges that a conspiracy through Michel, Bonney, Centola, and Jones existed and was motivated by their animus to deprive her of her employment position in retaliation for reporting and objecting to discriminatory and illegal practices. They acted in cohesion to deprive her of equal protection under the law and to deprive her of her constitutionally protected right in her position. They all acted in furtherance of the conspiracy when Jones fabricated a story that Fournier and Turner approached her to request a charger for the iPhone that the OIG now claims Morales stole.

102.     Michel, Bonney, Centola, Barrett, and Jones acted together to create and fabricate policy violations to deprive Morales of her constitutionally protected right in her position as a permanent civil servant. They provided statements that were misleading and/or false concerning unsubstantiated claims about Morales's candor and donation of an iPhone as well as failed to follow standards of investigation, created evidence in response to a subpoena duces tecum, tampered with and wrongfully withheld Morales personnel file from her, prevented other OIG employees from disseminating documentation prepared in response to a Public Records Request and subpoena duces tecum, and failed to provide her with required due process for the alleged violations for which she was suspended and terminated.

103.    The OIG, through Michel, Bonney, Centola, Barrett, and Jones conspired to deprive Morales of her position, which resulted in Morales's suspension without pay, termination, emotional distress and financial hardship.

### COUNT 3
**Louisiana Whistleblower Statute La. R.S. §23:967**

104.    Morales re-alleges and incorporates herein by reference all the foregoing allegations.

105.    Morales brings an action under the Louisiana Whistleblower Statute. Morales alleges that Michel through the OIG and City of New Orleans as her employer, retaliated against her after she advised I.G. Harper, OIG counsel and her other supervisors of violations of law.

106.    Morales disclosed violation of state and federal law when she made her internal complaints to the OIG of discrimination and disparate treatment, when she filed her EEOC Charge of discrimination, sought relief from harm from the CAO's office related to OIG disparate treatment and discrimination, when she advised of violations of the Public Records Law relating to her request for her personnel record, and when she advised of unethical and illegal practices by federal counterparts.

107.    Morales was subsequently disciplined, including a 30-day suspension without pay and termination of her position. One of the reasons listed for her termination and suspension includes a direct admission that she was being disciplined for filing an internal complaint of discrimination, grievances with the CAO office, and an EEOC charge of discrimination.

### COUNT 4
**42 U.S.C. §1983**
**Deprivation of a Vested Property Right**

108.    Morales re-alleges and incorporates herein by reference all of the foregoing allegations.

109.    The Fourteenth Amendment of the United States Constitution, as well as the Louisiana Constitution and Louisiana law establish a constitutionally protected property right to due process for civil servants.

110.    Morales enjoys a vested property right in her position as a civil servant and can only be terminated for cause after due process.

111.    Morales asserts a Fourteenth Amendment Procedural Due Process claim in that her letter or reprimand, suspension and termination were without cause, arbitrary and capricious, and that she was not afforded due process with regard to the allegations made against her, which resulted in a clear denial of her guaranteed and vested property right in her employment.

112.    Morales was not provided adequate notice and an opportunity to be heard in advance of the pre-disciplinary hearing, the hearing included discussion of accusations and alleged policy violations not included in the pre-disciplinary hearing notice; the OIG failed to follow its policies relating to the pre-disciplinary hearing and failed to provide written notice of the reasons for the adverse employment action and how the policies were violated; the OIG testified at her Civil Service hearing that she was terminated for stealing an iPhone and lying about it, an allegation that was not included in her disciplinary letters and to which she was never afforded due process; the OIG employees actions to create disciplinary issues in order to terminate her; and discipline for an allegations of policy violations that I.G. Haper and OIG counsel investigated and found to be baseless and not warranting discipline, in addition to the other actions outlined in paragraphs 17 through 85.

113.    Morales is entitled to relief for deprivation of a vested property right and due process violation under the Fourteenth Amendment.

## COUNT 5
### Title VII, 42 U.S.C. § 2000e-2(a)
### Disparate Treatment – Gender

114.    Morales re-alleges and incorporates herein by reference all the foregoing allegations.

115.    Morales is a member of a protected class, as a Latina female, and was qualified for the position she held as Criminal Investigator IV.

116.    Morales was the subject of mistreatment by several OIG employees, including but not limited to Ed Michel, William Bonney, and Michael Centola on the basis of her gender. On multiple occasions Morales was treated differently than other non-female employees, who were either disciplined less harshly or not at all for similar or more egregious policy violations than those alleged against Morales.

117.    In particular, Morales received a letter of reprimand for not keeping her hours up to date in Wingswept. However, during the same period of time William Bonney, Michael Centola and Terrence Barret, which comprised the remainder of the criminal investigations division also failed to put their hours into Wingswept but were not disciplined.

118.    Morales reported the discriminatory conduct to her employer, who failed to take reasonable remedial measures.

119.    Morales also filed an internal complaint about disparate treatment concerning denial of a pay increase based on her certifications, her male colleagues were awarded the pay increase based on the same certification that she was denied.

120.    Morales was required to maintain hours for her certifications while her male colleagues were not required to maintain their hours. When Morales complained about the disparate treatment, Bonney threatened Morales and subsequently engaged in a campaign of

retaliation.

121.    Actions through Michel, Bonney, and Centola, were taken with malice and reckless disregard for Complainants' right to be treated on an equal basis with men.

122.    Defendants City of New Orleans, and OIG through Ed Michel, Interim Inspector General did not take reasonable remedial measures to address the discriminatory actions, in reckless disregard for the Complainant's rights as secured by federal law.

123.    Morales is entitled to relief because Defendant City of New Orleans and OIG through Ed Michel discriminated against her in violation of 42 U.S.C. § 2000-e2(a).

### COUNT 6
### Violation of 42 U.S.C. §1981 and §1983

124.    Morales re-alleges and incorporates herein by reference all of the foregoing allegations.

125.    Morales is a member of a protected class, as a Latina Female. Defendant's actions are in violation of the rights afforded Morales by the Civil Rights Act 1866, 42.U.S.C. §1981, as amended by the Civil Rights Act of 1991.

126.    By conduct described above, Defendant City of New Orleans and the OIG through Ed Michel, intentionally deprived Morales of the same rights enjoyed by white citizens to the creation, performance, enjoyment and all benefits and privileges of their contractual employment relationship with Defendants, in violation of 42 U.S.C. §1981.

127.    As a result of Defendants discrimination in violation of Section 1981, Morales has been denied employment opportunities providing substantial compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Defendants actions, thereby entitling her to compensatory damages.

128.   In its discriminatory acts described in paragraphs 17 through 85 above, Defendants acted with malice or reckless indifference to Morales's rights, thereby entitling her to punitive damages.

129.   Morales is entitled to relief under this Count against the City of New Orleans and the OIG through Ed Michel in his Official Capacity.

**COUNT 7**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Disparate Treatment – Race**

130.   Morales re-alleges and incorporates herein by reference all of the foregoing allegations.

131.   Defendant City of New Orleans and the Office of Inspector General through Ed Michel discriminated against Morales on the basis of her race/ethnicity. Morales was treated differently than other similarly situated employees outside of her protected class. She was treated more harshly, targeted, scrutinized, and/or disciplined more severely than other non-Latin American and Caucasian similarly situated employees.

132.   Morales was suspended and terminated for making retaliatory grievances and complaints against her co-workers. However, Jones previously alleged that Morales was reading other employee emails, an allegation that was deemed unfounded by the I.G. but Jones was never disciplined for making her complaint.

133.   Lea Rae Webb a (Caucasian Female) filed a grievance against Morales in January of 2019 claiming Morales walked too close to her and invaded Webb's personal space. Webb was permitted to escalate her grievance to the CAO's office without discipline or retaliation from OIG management. One of the reasons cited for Morales's termination is her escalation of grievances to the CAO.

134.    Defendants City of New Orleans and OIG failed to exercise reasonable care either to prevent this discrimination or to promptly correct these practices.

135.    Defendants City of New Orleans and OIG's conduct was intentional and done with malice or with reckless indifference to Morales's federally protected rights.

136.    Morales is entitled to relief because the City of New Orleans and the OIG discriminated against her in violation of 42 U.S.C. § 2000-e2(a).

### COUNT 8
**State Law Discrimination based on Race and Gender and Retaliation**
**LA. R.S. § 23:3301 et. seq.**

137.    Morales re-alleges and incorporates herein by reference all of the foregoing allegations.

138.    Defendant OIG is liable to Morales under the Louisiana Employment Discrimination Law, La. R.S. § 23:3301 *et. seq*. as described in the preceding paragraphs and counts 1 through 7.

### COUNT 9
**Defamation La. C.C. art. 2315**

139.    Morales re-alleges and incorporates herein by reference all the foregoing allegations and specifically pleads the claim of defamation against Ed Michel.

140.    Michel defamed Morales, he made statements to others that Morales lacked candor, stole and iPhone that was OIG property, had "Giglio" issues in addition to other untrue statements made about her character and reputation.

141.    The claims were false and have been made in a public forum during her civil service appeals and published in an August 4, 2021, letter to the District Attorney Jason Williams, on the OIG twitter feed stating that "[t]he report was prepared by experienced investigators with significant expertise in federal, state, and local criminal investigations. If called to testify, they are

free from Giglio issues;" implying that Morales has "Giglio" issues that would prevent her from testifying in court in the future.

142.    Morales's professional reputation has been harmed by these statements and has prevented her from gaining employment within her field.

143.    In Louisiana, defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. *Fitzgerald v. Tucker*, 98-2313, p. 10 (La. 6/29/99), 737 So. 2d 706, 715; *Trentecosta v. Beck*, 96-2388, p. 10 (La. 10/21/97), 703 So. 2d 552, 559; *Sassone v. Elder*, 626 So. 2d 345, 350 (La. 1993). "Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Trentecosta*, 96-2388 at 10, 703 So. 2d at 559 (citing RESTATEMENT (SECOND) OF TORTS§ 558 (1977)).

144.    A defamatory communication is one that tends to harm the reputation of another to lower that person in the opinion of the community or to deter third persons from associating or dealing with him. *Sassone v. Elder,* 626 So. 2d 345, 352 (La. 1993).

145.    Defamatory words include almost any language which on its face tends to injure aperson's reputation. *Cortez v. Shirley,* 555 So. 2d 577, 579 (La. App. 1st Cir. 1989).

146.    The false and defamatory statements made by Michel have caused and continue to cause damage to Morales.

### **Count 10**
### **Social Media Cyberstalking/Hacking La. C.C. art. 2315**

147.    Morales also asserts a tort claim against Bobbie Jones for social media cyberstalking and hacking pursuant to La. C.C. art. 2315

148.    On May 19, 2021, Jones was at her place of employment at the OIG and hacked

into Morales's private Facebook account. Jones changed Morales's password, locked her out of the account and downloaded her activity.

149.    Morales was immediately notified when the password was changed, and she was locked out of her account.

150.    Morales called the number provided by the email from Facebook and Bobbie Jones answered. Morales instructed Jones to cease and desist that she was hacking into a private social media account. Jones refused to cease and desist and proceeded to download Morales's activity.

151.    Morales filed a police report with NOPD.

152.    Morales believes that Jones intentionally hacked her account in an attempt to breach her privacy and look for anything that Jones could use against Morales during her pending civil service hearing.

153.    Jones is liable to Morales for damages for cyberstalking and hacking into her private social media account.

## **JURY DEMAND**

154.    Morales demands a Jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, after due proceedings are had, Morales prays that this Complaint be deemed good and sufficient; and that this Court assume jurisdiction of this action and after trial:

     i.    Grant Morales compensatory damages for:

        1.    Mental Anguish, Anxiety, and Emotional Distress;

        2.    Back Pay, Loss of Future Earnings, and Loss of Earnings Capacity;

        3.    Loss of Benefits;

ii.  Grant Morales punitive damages in an amount to be determined at trial; and

iii.  Award Morales such other relief and benefits as the cause of justice may require, but not limited to, an award of costs and attorney's fees.

iv.  For any and all other just and equitable relief to which Morales may be entitled.

Respectfully Submitted,

*/s/ Stephanie Dovalina*
Stephanie Dovalina, LSBA #31137
700 Camp Street, Ste. 105
New Orleans, LA 70130
Phone No.: (504)528-9500
Mobile: (504) 339-9815
Fax: (504) 353-9516
stephanie@dovalinalawgroup.com
Attorney for Kristen Morales

Certificate of Service

I certify that on October 28, 2021, a copy of this filing was served contemporaneously on all attorneys of record via the court's CM/ECF system.

*/s/ Stephanie Dovalina*
Stephanie Dovalina